No. 3491

Second Circuit

CARROLL v. INTERNATIONAL PAPER
COMPANY

(May 8, 1929.  Opinion and Decree.)

Madison & Madison, of Bastrop, attorneys for plaintiff, appellant.

Todd & Todd, of Bastrop, attorneys for defendant, appellee.

REYNOLDS, J.  This is a suit under the Workmen's Compensation Law of Louisiana (Act No. 20 of 1914 as amended).  Plaintiff alleges that while carrying a cross-tie in the course of his employment by defendant he accidentally fell against a concrete post and to the ground with the tie upon him, and that in consequence his right·arm was pulled out of joint at the shoulder, and that he is permanently totally disabled to do work of any reasonable character.

He alleges that he is a carpenter and was earning $7 a day or $42 a week, and he prayed for judgment for 65 per cent of that sum for 400 weeks.

Defendant admitted the employment and accident, but denied that plaintiff was any longer disabled, and alleged in the alternative that, if plaintiff was still disabled, it was only to the extent of partial loss of use of function of his right arm and entitled to compensation only for such disability.

On trial there was judgment in favor of the plaintiff and against the defendant for $20 a week during disability, not exceeding 200 weeks, beginning January 30, 1928, with legal interest on each payment from its maturity, and fixing the fees of the medical experts, Drs. Garnier and Sims, at $25

each, and taxing the fees as costs, and defendant appealed. Plaintiff has answered the appeal and asks that the judgment be amended so as to award him the compensation allowed during disability not to exceed 400 weeks.

## OPINION

The evidence is conflicting and irreconcilable. That offered on behalf of plaintiff, if not disputed, would entitle him compensation as for permanent total disability, while that offered on behalf of defendant, if not disputed, would require that plaintiff's demands be rejected.

After carefully reading all the evidence we have reached the conclusion that plaintiff has permanently lost the use of function of his right arm.

However, he contends that he is permanently totally disabled to do work of any reasonable character, but this, we think, is clearly disproved by his own testimony and that of his other witnesses, which testimony shows that after the accident the arm was pulled back into place by a fellow workman of plaintiff and that plaintiff continued to work and use the arm the balance of the day of the accident, doing his work as well as he did it before the injury, and then ceased work and was under the doctor's care for about a week, and then returned to work and continued to do the kind of work he had formerly been doing and did it as well as he formerly did, for a period of 15 days, when himself and the other workmen of his gang were laid off; receiving during this time the same wages that he had been receiving before the accident.

L. E. Barbary, a witness for defendant, testified that he was defendant's superintendent of construction, and that plaintiff worked under him; that he missed plaintiff at his work, and on inquiry learned that he had been hurt; that later plaintiff returned to work; that plaintiff made no complaint to him about being hurt; that after plaintiff returned to work he was able to do and did do a full man's work and would not have been retained if he had not been able to do so.

He testified:

"Q. Now, when Mr. Carroll went back there, what was he doing?

"A. The first time he came back after being hurt—the following Monday afterwards?

"Q. Yes.

"A. Building crates to ship paper in.

"Q. What did he do the second time?

"A. The second time is where he had that heavy work.

"Q. What did he do?

"A. Using a cross-cut saw and carrying those 6x8 timbers, and everything that had to be done."

C. D. Culbeth, a witness for defendant, testified that he was employed by defendant as "scratch-foreman," and that since the accident plaintiff had worked under his direction in the construction of a storeroom or warehouse. He said:

"Q. Was Mr. Carroll working under you at the time you were constructing the storeroom or warehouse?

"A. He was.

"Q. What were his duties in that connection?

"A. He had to frame timbers and handle six by eights, and handle a cross-cut saw; and the general work we had in our line.

"Q. When was it he worked for you?

"A. In March, 1928.

"Q. Did he complain to you about his arm?

"A. He did not.

"Q. Do you recall how long he worked for you?

"A. Approximately a month, or three weeks; something like that."

He further testified that there was no difference in the kind or amount of work

plaintiff then was doing as compared with the amount or kind done by his fellow workmen; that plaintiff's fellow workmen did not help him over hard places; that plaintiff performed a full day's work every day; and that he made no complaint either as to his physical condition or that he was unable to do the work. He further said:

"Q. That construction work is heavy, physical labor, is it not?

"A. It requires a man to be in good physical condition to do that work."

Doctor W. H. Garnier, a witness for defendant, testified:

"Q. What do you think is the cause of Carroll's present condition?

"A. I think, if it is anything, it is due to a focus of infection causing, as Doctor Wright said, a bursitis or rheumatic condition of his shoulder.

"Q. Do you think the injury he sustained in January, 1928, resulted in his present condition?

"A. No, sir.

"Q. When you re-examined Mr. Carroll some two or three weeks after the injury, what did he tell you about any further treatment?

"A. He said if Barbary would give him his job back, everything would be all right."

This testimony satisfies us that plaintiff was not permanently totally disabled. However, he testified that after the accident he worked under great pain and that he has not been able to perform the work of a carpenter for any considerable length of time.

Dr. George Wright testified:

"Q. What would you say, doctor, about the probability of a permanent cure of this condition by proper treatment?

"A. I think he could be cured, yes.

"Q. What treatment would you suggest?

"A. Drainage of the bursa.

"Q. Explain that?

"A. It means an incision of the infected area and the inflammatory condition eliminated.

"Q. If that were done, in your opinion the present disability would disappear?

"A. Yes, sir."

Doctor L. E. Larche testified:

"Q. Did you examine plaintiff's shoulder?

"A. I did.

"Q. What did you find the condition to exist?

"A. I found on examination that it was very tender all over the area of the shoulder joint, and very painful to manipulation and massage, and also on exercising the joint. He could not bring his arm back hardly to his hip pocket. I had to try him to get a handkerchief from his hip pocket, and he couldn't do it. He couldn't raise his hand to his head. He couldn't raise it further than about at right angles.

"Q. Did he have the use of his shoulder?

"A. No, sir.

"Q. Doctor, this man is a carpenter. From his physical condition, is he able to do carpentering work?

"A. I should not think so."

Plaintiff testified that after he sustained the injury complained of he worked for a Mr. Key for 8 days, and that Mr. Key turned him off because he could not do the work, and that he then went to work at the pulp mill under Mr. Calhoun and worked there for about 2 weeks and was let out by Mr. Calhoun for the same reason, and that he then worked 1 day for a Mr. Vines, and that Mr. Vines would not keep him because he could not nail above his head.

This evidence convinces us that plaintiff has lost the use of function of his right arm, so far as doing carpentering, his usual work, is concerned. It is true the evidence shows that he can use the forearm to some extent, but it also shows that he is unable to do carpenter work and hold a job as a carpenter. And this, under our interpreta-

tion of the law, amounts to loss of use of function of the arm.

"The Employers' Liability Act should not be strictly construed in favor of the employer but rather liberally in favor of the employee." Watkins v. Roach, 4 La. App. 258.

"A permanent total loss of the use of a member is equivalent to the amputation of the member." Act 85 of 1926, sec. 8, subsec. 1, cl. (d), par. 14.

"In the following cases the compensation shall be as follows:

\* \* \* "For the loss of an arm, sixty-five per centum of wages during two hundred weeks." Id., par. 6.

We find no error in the judgment appealed from, and accordingly it is affirmed.