No. 4197

Second Circuit

———

ALLEN v. GEORGE E. BREECE LBR. CO.

———

(January 14, 1932. Opinion and Decree.)

———

Argued before DREW, McGREGOR, STEPHENS, JJ.

Vinson M. Mouser, of Columbia, attorney for plaintiff, appellee.

Hudson, Potts, Bernstein & Sholars, of Monroe, attorneys for defendant, appellant.

DREW, J. This is a suit under the Workmen's Compensation Act, and the sole question for decision is the extent of injury to plaintiff's foot.

Plaintiff contends that he has entirely lost the use of function of his right foot and is entitled to 65 per cent of his weekly wages for a period of one hundred and twenty-five weeks. Defendant contends that, although the foot was injured to such an extent as to amount to total loss of use of function of that member for a period from October 23, 1929, to June 9, 1930, during which time compensation was paid, that on June 9, 1930, and ever since, his foot has been entirely well, and it owes no further compensation.

The lower court rendered judgment for plaintiff for 65 per cent of his weekly wages for a period of not more than one hundred twenty-five weeks, less the number of weeks previously paid by defendant, and from this judgment defendant has prosecuted this appeal.

Plaintiff was checking lumber and getting slabs straight on the slacker. In describing the slacker, we will use plaintiff's own words:

"Q. What kind of machinery was the slacker?
"A. Where we get the slabs off the chain to saw.
"Q. How did the chains work?
"A. Come off from the roller and fall on the chain and the chain carries them to the saw.
"Q. Did the chains carry the lumber to the saw?
"A. The slabs."

This chain had spurs on it to hold the slabs. Plaintiff was caught in one of these spurs on the chain where it comes over the table and his foot was pulled under the end of the board or side of the board. Plaintiff described the injury received in the following language: "My foot was torn—the top torn off." All the flesh and ligaments leading to his toes, except the big toe, was torn off.

The accident occurred on October 23, 1929, and plaintiff was confined in the Riverside Sanitarium for forty-one days. He used crutches from that time until April or May, 1930, and since laying aside his crutches, has continued to use a cane for assistance in walking. Plaintiff testified that he had not been able to stand on his foot to do any work up to the time of trial; that he could only walk three blocks with the assistance of a cane, before giving out; and, when asked what was the main disability or inconvenience with his foot, he said:

"A. It gives out. This side of my foot does, and my ankle, and it runs up in my ankle. The main part is from the ankle to the foot."

He says the foot gives down and there is a weakening up through his leg.

This case was tried in the lower court in April, 1931, and plaintiff testified to the condition of his foot at that time, as follows:

"Q. What is the condition of the top of your foot and toes at the present time?
"A. Scar from the injury and my toes are stiff, and my foot.
"Q. Does the scar seem to be grown to the foot?
"A. Everything is grown tight and my toes are stiff.
"Q. Your four toes are stiff?
"A. Yes, sir.
"Q. Can you put those toes on the floor? Will they straighten out?
"A. Cannot put them on the floor, no, sir, with my hand. I can put my big toe down.

"Q. Have to push the others down with your hand?

"A. I can't push them down with my hand. * * *

"Q. Are you able, Mr. Allen, to stand on your foot and use it to get about enough to do any kind of ordinary work that requires standing up and walking?

"A. Not all of the time.

"Q. How is that?

"A. Not all the time. If I had time— give me time to rest—but I couldn't stand on my foot all day.

"Q. You state you can only stand and walk about three blocks without stopping?

"A. That's all."

Dr. L. A. Masterson testified that he examined plaintiff's foot in October, 1930, about one year after the accident and injury; that plaintiff gave him a history of the case, as testified by plaintiff; and that from his examination he found the following (using his own words):

"Well, on the examination in October, 1930, he had an adherent lineal scar on the top of the right foot. This scar was say from lateral to medial, toward the toes; wide, ragged edge scar. This scar was attached to the top structures of the foot. The tendons were incorporated in the scar. He was unable to either flex his foot upward or downward, dorsal or vertical flexion, except his first toe. He had some motion of the big toe. There was some swelling of the foot at this time, and there was tenderness over the region of the scar on deep pressure. He was unable to bear his weight on his toes of the right foot, nor could he raise his weight on the toes of the right foot. He walked with a decided limp, with the aid of a cane."

He further testified that the condition of the foot would remain permanent, permanent loss of function, and that plaintiff could not use the foot to do ordinary work, and that the pain caused by use of the foot will always remain permanent.

Dr. R. W. O'Donnell was called on by defendant to examine plaintiff. Defendant did not summon him to court and plaintiff called him and used him as his witness. Dr. O'Donnell examined plaintiff in December, 1930, and testified to his findings as follows:

"A. The conditions at the time showed considerable scar tissue on the top of the foot—right foot—and complete impaired flexion and extension of the toes of the right foot. But not involving the great toe of the right foot.

"Q. Can he lower the second, third, fourth, and fifth toes to the floor?

"A. No, sir. He can't get them to the floor but he can bend them over. He can get them on a straight line but cannot bend them.

"Q. Up and down?

"A. Up and down.

"Q. So far as they are concerned they are stiff?

"A. Yes, very little motion in the toes.

"Q. Does pressure on scar tissue illicit pain? (Correction, 'elicit.')

"A. Not necessarily in scar tissue, but the scar tissue acts as a foreign body on the tissues below and forms pain.

"Q. Causes pain by the scar tissue acting as a foreign body and pressing on the tissues below?

"A. Yes, sir.

"Q. Would he experience pain in walking on the foot?

"A. Wherever he would put pressure or strain on the scar it may cause pain.

"Q. Normal use in walking would put that pressure on there, would it, doctor?

"A. Well, if he was using his toes, throwing his weight on his foot, it would very likely cause some pain, because the scar is attached and doesn't move."

Dr. O'Donnell further testified that he considered plaintiff's foot 25 per cent insufficient for manual labor and that he could not do a full day's work; that his condition was permanent and that he will always have pain in using the foot. He says plaintiff could do light work, provided he could sit down and rest when he

grew tired. If he could not sit down and rest, he would play out before eight hours.

Defendant offered Dr. J. T. French, the regular physician for the defendant company, who testified that he examined plaintiff immediately after the accident. He found the skin and surface of the foot abrased and the ligaments of four toes torn loose, the four small toes; that he treated plaintiff until June, 1930, when he considered him well. The last time he saw and examined plaintiff's foot was with Dr. O'Donnell in December, 1930. Dr. French testified that it was impossible to say definitely as to the degree of pain in an injury of that nature, but, in his opinion, there should not be any pain. When he released plaintiff in June, 1930, he was in a condition to do ordinary work and that he so advised the defendant company. He does not think the foot will ever get any better. He further testified that plaintiff is sixty years of age, and the injury involved nothing but the four toes on the right foot and the adhesions of the scar proper on top of the foot, and that caused a stiffness of the toes. Dr. French sees no reason why plaintiff could not walk without a cane. On cross-examination, he testified in part as follows:

"Q. You don't think his foot will ever get any better?
"A. No, sir.
"Q. The flesh and muscles were torn off, scraped off the top of the foot, weren't they?
"A. Yes, sir.
"Q. Clear to the bone, so to speak?
"A. The bone was not exposed, but down almost to the bone. The skin and muscles on top of the foot are very thin. It was down to the ligaments proper.
"Q. No particular muscle left on top of that foot, is there?
"A. Granulated in by granulated tissues.
"Q. What he has there is a skeleton of a foot with skin stretched over it and the scar is fastened to all four of the toes?

"A. Yes, sir.
"Q. You notice him limp?
"A. Yes, I noticed that.
"Q. You notice the use of the cane?
"A. Yes, sir.
"Q. You are not prepared to say that he cannot walk without that cane?
"A. It's my opinion that he can."

The manager of the defendant company testified that he offered plaintiff a job sweeping, where he could sit down or rest for a moment, if necessary, and also offered him a job sitting down running a driller, and plaintiff refused both. Plaintiff denies that he was offered the jobs.

For reasons unnecessary to state, we have carefully reviewed the testimony of each witness in the case and are convinced that the preponderance of the testimony shows that plaintiff has totally lost the use of function of his right foot, within the meaning of the Workmen's Compensation Act of Louisiana. We know of no better test of the loss of use of function of a member of the body, that has not been amputated, than the inability to perform ordinary labor, due to the injured member.

Plaintiff and the two doctors who testified in his behalf are corroborated, we think, very strongly by the testimony of the manager of the defendant company, who testified that after defendant's doctor had pronounced him well, he offered him jobs that would not require plaintiff to stand on or use his foot. If he was well, there was no reason for him to be shown such favors and there is no reason given why his own job was not offered to him.

Our interpretation of section 8, subsection 1, subd. d, par. 7, of the **Workmen's** Compensation Act of the State of Louisiana, as amended by Act No. 85 of 1926, and

section 8, subsection 1, subd. d, par. 15, is that where the injury to the foot, which is not amputated, is such as to prevent an ordinary laborer from performing ordinary labor for a day of eight hours, as was his custom before the accident, he is entitled to compensation at the rate of 65 per cent of his weekly wages for a period not to exceed one hundred twenty-five weeks. To hold otherwise would work an extreme hardship on one who has an injured foot, as above set forth, for common reasoning tells us that one who is disabled from performing a full day's work of eight hours cannot secure a job at a sawmill or any other industrial plant. This doctrine, we think, is laid down in the following cases decided by this court: Dykes v. Ruddle, 14 La. App. 106, 128 So. 686; Carroll v. International Paper Co., 14 La. App. 532, 122 So. 131. And by the First Circuit Court of Appeal in the case of Wells v. New Amsterdam Casualty Co., in 11 La. App. 284, 123 So. 417.

We find no error in the judgment of the lower court, and it is affirmed, with all costs.

———

McGREGOR, J. (dissenting). On October 23, 1929 plaintiff was in the employ of defendant, who was engaged in the general sawmill business. On that date he was handling slabs of timber and keeping them straight on what is known as the "slacker." While he was performing these duties, his right foot was caught in the machinery and severe injury was inflicted upon the top of it. The skin and surface of the foot were abrased and the ligaments of the four small toes were torn loose. He was immediately sent to a sanitarium, where he remained for forty-one days and received treatment. At the end of this time he was removed to his home and had to use

crutches until about April or May, 1929, and from then on used a cane in walking. On June 9, 1930, he was discharged by the defendant's physician, Dr. J. T. French, and declared to be well and able to resume work. He denies that he has ever been able to do any work since the discharge and says that he cannot walk without the use of a cane. The defendant had been paying him regular compensation for total disability up to the date of his discharge, but from that date it refused to pay any more.

The plaintiff has a foot injury pure and simple, and the law applicable to the case is section 8, subsection 1, subdivision "d," paragraph 15, of the Workmen's Compensation Law of Louisiana, and reads as follows:

"In all cases involving a permanent partial loss of the use of function of the member mentioned hereinabove, compensation shall bear such proportion to the amounts named herein for the total loss of such member as the disability to such member bears to the total loss of the member, provided that in no case shall compensation for an injury to a member exceed the compensation payable under this act for the loss of such member."

The only question to be determined is the proportion of permanent loss of the use of the foot that has been suffered by the plaintiff.

Plaintiff's right to compensation depends solely upon the proportion of disability to his foot, and not upon his incapacity to hold a job. One might have one's foot amputated and on account of it might be wholly incapacitated for holding the job in which the injury was received, and yet compensation would be limited to one hundred twenty-five weeks. If one should suffer the total loss of the use of a foot, that would be equivalent to having the foot am-

putated and the compensation would be limited to one hundred twenty-five weeks, even though the condition existing in the foot should cause total incapacity for holding the job in which the foot injury was received. Likewise, if one should suffer such an injury in the foot as to amount to the permanent loss of one-half of its use, compensation would be awarded for one-half of 65 per cent of the wages for a period of one hundred twenty-five weeks, notwithstanding the fact that the partial disability of the foot might cause *total incapacity for holding the job in which the injury was received.* Finally, if one should suffer an injury to the foot which for many weeks totally disabled it and then settled into a condition such as to result in a permanent partial loss of the use of the foot, compensation would be awarded on the *basis* and for the *period* of a *foot injury,* and *not on the inability to hold the job in which the injury was received.* In other words, compensation would be awarded for 65 per cent of the wages for the number of weeks during which the total loss of the use of the foot lasted, and for the rest of the one hundred twenty-five weeks the compensation would bear such a proportion to 65 per cent of the wages as the disability would bear to the total loss of the use of the foot.

In this case the plaintiff evidently suffered the total loss of the use of his foot from the date of the injury to June 9, 1930, or an approximate period of thirty-two weeks. At the time of the trial he was walking with the use of a cane and was contending that he was still suffering the total loss of the use of his foot. He testified in his own behalf that he had not done a day's work since the date of the injury and that the disability on his foot consisted of a weakening or giving down. *Nowhere in his testimony does he speak of*

*any pain* in describing the condition of his foot at the time of the trial. He states that his four small toes are stiff, and that the skin on top of his foot is tight, and that consequently he cannot do any kind of ordinary work that requires standing up and walking all the time.

Dr. L. A. Masterson, a witness for the plaintiff, testified that he examined him in October, 1930, a year after the injury and again about a week before the trial. On cross-examination he testified as follows:

"Q. The swelling has gone out of that foot, has it not?
"A. It has now.
"Q. As I understand it about the only disability in that foot is the scar tissue has grown, in mending, to the tendons of the second, third, fourth and fifth toes, and will not allow proper flexion either up or down?
"A. Yes, sir.
"Q. You think that man could do light work now, Doctor?
"A. I think he could do light work.
"Q. How long do you think he has been in that condition?
"A. Which condition?
"Q. Where he has been able to do light work?
"A. I have not seen him enough to know that."

Dr. R. W. O'Donnell, another witness for plaintiff, on direct examination said:

"Q. With his foot in the condition it is in can he hold an ordinary job of manual labor, where it requires standing as much as eight hours a day? Standing and walking eight hours a day?
"A. I estimated his foot, to do that, was seventy-five per cent,—I consider about twenty-five per cent inefficient for manual labor."

On cross-examination he said:

"Q. What do you estimate the disability of that foot to be, Doctor?
"A. About twenty-five per cent."

Dr. J. T. French, a witness for the defendant, testified that he treated the plaintiff from the date of the injury, October 23, 1929, until June 9, 1930, when he discharged him as cured. He stated that the disability was total for a period of at least four months, and that from then until June 9 it was partial, and that from then to the time of the trial there was none.

The above three physicians are the only ones testifying in the case. Of the two sworn for the plaintiff, Dr. Masterson says that he can do light work, and Dr. O'Donnell is positive that the loss of the use of the function of the foot is not more than one-fourth. That is all the expert medical testimony produced by the plaintiff. Dr. French, testifying for the defendant, and basing his testimony on his observation of plaintiff during the entire time that he treated him, says that he is of the firm opinion that at the time of the trial plaintiff was suffering from no disability at all in his foot. In all fairness I think that plaintiff should be bound by the testimony of his own witnesses.

In the majority opinion it is stated that plaintiff is corroborated in his contention for total disability of his foot by the fact that the defendant offered him light work —jobs that did not require him to stand on or use his foot. The testimony of the defendant on this point was given by George E. Breece, manager of the defendant company, and is as follows:

"Q. You the manager of the Breece Lumber Co. of Monroe?

"A. Yes, sir.

"Q. Please state whether or not on June 9, 1930, you offered Mr. Allen a position in sweeping out at the same salary he was getting?

"A. Offered him a job sweeping, and offered him a job sitting down running a driller and he refused to do that work.

"Q. He refused to do that work?

"A. Never worked. * * *

"Q. That job running a driller he would not have to stand on his feet?

"A. No.

"Q. And sweeping, he could rest when he wanted to?

"A. That's the way I do all fellows that are injured.

"Q. A one-legged man could handle a sweeping job?

"A. I don't employ one-legged men.

"Q. If you did he could do it?

"A. No, sir, not in my plant.

"Q. And the sweeping job, Mr. Allen could rest as often as he wanted to?

"A. Yes, sir.

"Q. If he needed rest every five minutes he could sit down and rest?

"A. That was satisfactory.

"Q. If he needed rest every minute he could have done that?

"A. All he had to do was just report for work."

My appreciation of this testimony is that the defendant was willing to make every possible concession to the plaintiff in the matter of assisting him with work. I see nothing in this offer that should be construed as an admission in regard to the disability of the plaintiff. But be that as it may, the plaintiff *denies absolutely that the defendant made such an offer.*

In the majority opinion it is stated in effect that where the injury to a member, if not amputated, is such as to prevent an ordinary laborer from performing ordinary labor for a day of eight hours, as was his custom before the accident, the injured party is entitled to compensation at the rate of 65 per cent of his weekly wages for a period not to exceed the period during which compensation would be due if the member were a total loss. I cannot agree to this statement of the law. It is true that it is the unbending policy of the courts to interpret the Compensation Act liberally in favor of the laborer, and this is

right and fair. But there are two outstanding facts that must be considered in this case: (1) Loss of the use of the function of the member is not measured by *disability to hold the same job* as was held when the injury was received, and (2) the plaintiff must actually prove his case just as is required in ordinary cases. Plaintiff produced two witnesses in his behalf— both reputable physicians whose testimony is based on recent physical examinations. One says he has lost one-fourth of the use of his foot and the other says he can do light work. The defendant's witness, the physician who treated the plaintiff, says he thinks he has the full use of the foot. Under that state of facts, I think that the most liberal judgment that could be rendered would be for one-fourth of 65 per cent of $15 for ninety-three weeks, beginning June 9, 1930.

The opinion of the majority relies on three cases decided by the Courts of Appeal of this state.

Dykes v. Ruddle, 14 La. App. 106, 128 So. 686. In this case the court states that the testimony is conflicting as to the condition of the plaintiff's leg. In the present case that is not true, in that there is no testimony outside of the plaintiff when testifying in his own behalf that even contends that he has lost the total use of the function of his foot. One says he has lost one-fourth, another says that he can do light work, and the last says he has the full use of the member.

Carroll v. International Paper Co., 14 La. App. 532, 122 So. 131. In that case the evidence was "conflicting and irreconcilable," and the doubt was resolved in favor of the plaintiff. In this case I find no such condition.

Wells v. New Amsterdam Casualty Co., 11 La. App. 284, 123 So. 417. The testimony was apparently conflicting, but the court was able to reconcile it in favor of the plaintiff. In the present case no physician could be found who would say that plaintiff had lost all the use of his foot.

I cannot agree with the finding of the majority opinion, and find no support for the opinion handed down in the cases cited and relied upon. I, therefore, respectfully dissent.

DREW, J. On January 14, 1932, judgment was rendered by this court in the above numbered and styled cause, and on February 3, 1932, the wife and children of the plaintiff, C. C. Allen, appeared by motion and showed to the court that C. C. Allen departed this life on November 28, 1931. As the plaintiff was dead before judgment was rendered by this court, it necessarily follows that said judgment was without effect and a nullity.

In the motion above referred to, the wife and children of the deceased plaintiff, C. C. Allen, pray that they be substituted as parties plaintiff in the suit for C. C. Allen, deceased. It is therefore ordered, adjudged and decreed that the judgment of this court rendered in this case on January 14, 1932, be now set aside and annulled, and the case be replaced on the docket of this court for the purpose of trial. It is further ordered that Mrs. C. C. Allen, Bill Allen, Mrs. Mabel Jackson, Carl Allen, Clyde Allen, Mrs. Ruby Keever, and Alfred Allen, all of age, be and they are hereby substituted as parties plaintiff in this suit in the place and stead of C. C. Allen, now deceased, and are authorized to prosecute this suit and stand in judgment herein.